AES:SCJ
F.# 2017R01691

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – X

IN THE MATTER OF AN APPLICATION FOR A
SEARCH WARRANT FOR:

THE PREMISES KNOWN AND DESCRIBED AS
9 STREAM COURT, GREAT NECK, NEW YORK,
11023

– – – – – – – – – – – – – – – – – – – – – X

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR A SEARCH
WARRANT

Case No. 19 MJ 806

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

      I, Jaclyn Nunez, being first duly sworn, hereby depose and state as
follows:

### INTRODUCTION AND AGENT BACKGROUND

      Upon information and belief, there is probable cause to believe that there is

located in THE PREMISES KNOWN AND DESCRIBED AS 9 STREAM COURT,

GREAT NECK, NEW YORK, 11023 (the "PREMISES"), further described in Attachment

A, the things described in Attachment B, which constitute evidence, fruits and

instrumentalities of conspiracies to commit wire and bank fraud, in violation of Title 18,

United States Code, Sections 371 and 1349, and wire fraud, in violation of Title 18, United

States Code, Section 1343, and money laundering, in violation of Title 18, United States

Code, Sections 1956 and 1957.

The source of your deponent's information and the grounds for her belief are as follows:[1]

1.      I am a Special Agent with the Federal Housing Finance Agency – Office of the Inspector General ("FHFA-OIG") and have been so since January 2016.  Since October 2017, I have been assigned to the El Dorado Task Force which consists of members from a number of law enforcement agencies, including the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and investigates financial crimes.   As a Special Agent, I am responsible for investigating violations of, among other crimes, Title 18, United States Code, Sections 371 (conspiracy against the United States), 1343 (wire fraud), 1344 (bank fraud), 1349 (wire and bank fraud conspiracy), 1956 and 1957 (money laundering).  I have participated in all aspects of financial fraud investigations, including conducting surveillance, executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing public records and bank records.  I am aware that white collar criminals commonly use electronic means of communication in furtherance of their criminal activities, including but not limited to telephones and electronic mail.  As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

---

[1]      Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

2.      I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement and regulatory authorities; (c) information obtained from confidential sources of information, (d) interviews with witnesses and victims; (e) information obtained from the execution of search warrants; and (f) review of surveillance photographs and other records and reports.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

3.      On September 6, 2019, a grand jury returned a seven-count indictment against Iskyo Aronov, also known as "Isaac Aronov," Michael Konstantinovskiy, also known as "Michael Kay," Tomer Dafna, Avraham Tarshish, also known as "Avi Tarshish," and Michael Herskowitz, and arrest warrants were issued.  The indictment and arrest warrants remain under seal, and these individuals are expected to be arrested shortly.  A copy of the indictment is attached as Attachment C.

I.      **The Relevant Individuals and Entities**

4.      In or about 2017, FHFA-OIG and HUD-OIG, initiated the instant ongoing criminal investigation.  A more detailed description of the indicted defendants is set forth below, including certain locations and entities that they were connected to in or about and between March 2013 and November 2018:

(a)      Aronov was a resident of Queens, New York.  He was the President of My Ideal Property Inc. ("MIP").  Aronov also controlled a number of other corporate entities

formed to buy and sell real property, including MIP Management Inc., LL Organization Inc., LL Fund Inc., IA Investors LLC, AG2 Equities, Inc., PIM Equities Inc. and IJ Development LLC.

(b)     Konstantinovskiy was a resident of Queens, New York.  He was a New York-licensed real estate broker, the President of National Homeowners Assistance Inc. ("NHA") and Manager of Settle NY Corp.

(c)     Dafna, the current resident of the PREMISES, was an owner of Exclusive Homes Realty Group Inc. and Exclusive Homes NY, LLC (collectively, "Exclusive Homes") and Homeowners Solutions Group LTD ("Homeowners Solutions"). Dafna also controlled 5 Borough Construction Management LLC and a number of corporate entities formed to buy and sell real property.

(d)     Tarshish was a resident of Queens, New York.  He first worked for MIP and then became an owner of Exclusive Homes and Homeowners Solutions.  Tarshish also controlled a number of other corporate entities formed to buy and sell real estate, including My Ideal Holdings LLC, Eliya Properties LLC and 1319 Holdings LLC.

(e)     Herskowitz was a resident of Brooklyn, New York.  He was a New York-licensed attorney who represented parties involved in real estate transactions.

(f)     MIP was a New York corporation with its principal place of business located at 116-55 Queens Boulevard, Suite 206, Forest Hills, New York.  Aronov formed MIP on or about December 5, 2012.  MIP marketed itself as a real estate development company that was focused on rehabilitating distressed properties.  MIP claimed that it built,

maintained and marketed properties, and that it had developed a list of professionals it worked with, including mortgage bankers, inspectors, engineers, attorneys, insurance representatives, short sale processors and other professionals who were involved in the process of buying and selling property.

(g)     NHA and Settle NY Corp. were New York corporations with their principal places of business located at 116-55 Queens Boulevard, Suite 206, Forest Hills, New York.  Konstantinovskiy formed NHA or on about December 3, 2012 and Settle NY Corp. on or about July 3, 2015.  NHA and Settle NY Corp. were short sale processing companies that purported to represent distressed home owners in negotiations with their mortgage lenders.

(h)     Exclusive Homes were companies with their principal places of business located at 914 Bedford Avenue, Suite 1, Brooklyn, New York.  Tarshish formed Exclusive Homes NY, LLC on or about May 19, 2014 and Exclusive Homes Realty Group Inc. on or about July 25, 2014.  Exclusive Homes engaged in real estate investment.

(i)     Homeowners Solutions was a company with its principal place of business located at 893 Bedford Avenue, Brooklyn, New York.  Tarshish formed Homeowners Solutions on or about July 23, 2014.  Homeowners Solutions purported to represent distressed homeowners who sought to sell their properties in short sales.

## II.   **Definitions and Background**

5.     A mortgage loan was a loan from a financial institution to a borrower for the purchase of a real property, typically a home, which secured the loan.  Mortgage

loans were often sold by the financial institution that originated the loan, and the final holder of a mortgage loan is referred to as "lender" herein. A servicer handled the administrative functions of a mortgage loan for the lender, such as collecting the borrower's payments and communicating with the borrower. A lender could either be the servicer or have a third party as the servicer. Lenders and servicers often were financial institutions, such as federally insured banks or mortgage lending businesses.

6. "Loss mitigation" was a process in which a borrower and a lender or servicer worked together to lessen the loss to the lender resulting from the borrower's default on a mortgage loan. One loss mitigation program was a pre-foreclosure sale, otherwise known as a "short sale," which allowed a borrower to give up his or her property without a foreclosure. In a short sale, with the approval of the lender or servicer, a borrower sold his or her home for less than the outstanding balance of the mortgage loan. The proceeds from the short sale, minus approved closing costs, were applied to the outstanding mortgage loan balance owed to the lender, who typically agreed to forgive the borrower's remaining mortgage loan balance.

7. Prior to approving a short sale, lenders and servicers typically required the preparation of an objective appraisal of the property, either in the form of a broker price opinion or an appraisal, to compare against the proposed short sale price. In addition, lenders and servicers typically required the parties to a proposed short sale to submit documents and information to show that, among other things, (a) the borrower was unable to pay the mortgage loan; (b) the borrower had listed the property on the open market for a set period of

time before accepting the short sale offer; (c) the sale was an "arm's length transaction," defined as one between two unrelated parties without hidden terms or special understandings; and (d) all the funds paid in connection with the short sale were disclosed to the lender or servicer.

8.     The United States Department of Housing and Urban Development ("HUD") was a department of the Executive branch of the federal government.  The mission of HUD was to aid individuals and communities in the development and purchase of affordable housing.  The Federal Housing Administration ("FHA") was an agency of HUD. FHA provided mortgage insurance to FHA-approved lenders who provided mortgage loans to borrowers that met certain eligibility requirements.

9.     The Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") were federally chartered, stockholder-owned corporations that bought mortgage loans from lenders to provide liquidity, stability and affordability to the mortgage loan market.  After purchasing a mortgage loan, Fannie Mae and Freddie Mac either held the mortgage loan or packaged it with other mortgage loans into a mortgage-backed security.  Fannie Mae and Freddie Mac guaranteed the timely payment of principal and interest on the mortgage loans it securitized. Profits generated by Fannie Mae and Freddie Mac were paid to the United States.

10.     HUD permitted short sales of properties with FHA-insured mortgage loans under its Pre-Foreclosure Sale ("PFS") Program if the lender or servicer determined that the borrower and the short sale transaction met HUD's requirements.  Among other

things, HUD required the parties to a short sale to certify to the lender or servicer in a Pre-
Foreclosure Sale Addendum ("PFS Addendum"), sometimes referred to as a Short Sale
Affidavit or an Arm's Length Transaction Affidavit, that the sale was an arm's length
transaction characterized by a selling price and other conditions that would prevail in an open
market environment.  The PFS Addendum typically required the parties to a short sale to
affirm, among other things, that: (1) there were no hidden terms or special understandings
between any of the parties involved in the transaction; (2) any relationship or affiliation
among the parties involved in the transaction had been disclosed to the lender or servicer; (3)
neither the buyer nor the seller would receive any funds or commissions from the sale; (4)
there were no current or pending higher offers, or contracts relating to the current sale or
subsequent sale of the property that had not been disclosed to the lender or servicer; (5) all
amounts paid to any person or entity in connection to the sale were approved and reflected on
the HUD-1 Settlement Statement; and (6) the property had been listed for sale for a certain
amount of time before any offers were evaluated and the presented offer yielded the highest
net return to the lender.  Lenders and servicers relied on the parties' representations in the
PFS Addendum and other transaction documents to ensure that any short sale of a property
with a FHA-insured mortgage loan met HUD's requirements.

> 11.    Both Fannie Mae and Freddie Mac also issued rules for servicers to
follow to obtain approval of short sales of property secured by mortgage loans that Fannie
Mae or Freddie Mac owned or had securitized.  These rules required, among other things,
that a short sale be an arm's length transaction.  Fannie Mae and Freddie Mac also required

that the parties to a short sale execute a short sale affidavit, which contained similar representations to those required by HUD referenced above. In addition, Fannie Mae and Freddie Mac typically made the approval of a short sale contingent on the prohibition of any resale of the property for 30 days following the short sale closing, and the prohibition of any resale for more than 120 percent of the short sale price for the period beginning 31 days, and ending 90 days, after the short sale.

12. The New York Uniform Commercial Code ("UCC") was a set of state laws applicable to commercial transactions in New York, such as the sale of goods. It also covered secured transactions, where a lender gained the right to foreclose on a borrower's collateral should the borrower default on the loan. If the borrower's collateral was fixtures to real property, then a UCC-1 Financing Statement was filed with the county where the real property was located.

**III. Overview of the Short Sale Scheme**

13. In or about and between December 2012 and January 2019, Aronov, Konstantinovskiy, Dafna, Tarshish and Herskowitz, together with others, conspired to defraud lenders, including Fannie Mae and Freddie Mac, and certain borrowers (collectively, the "Short Sale Victims") by providing them with false, misleading and incomplete information to induce them to execute short sales at fraudulently depressed prices, thereby causing losses to the lenders and, at times, the borrowers (the "Short Sale Scheme"). Aronov, Konstantinovskiy, Dafna, Tarshish, Herskowitz and a number of other individuals, including Short Sale Co-Conspirators 1, 2, 3,       (collectively, the "Short Sale Co-

Conspirators"), worked both together and separately to purchase hundreds of properties at fraudulently depressed prices and then resell or "flip" the properties for large profits.

14. The Short Sale Scheme originated at MIP under the direction of Aronov with the assistance of Konstantinovskiy and Tarshish, Short-Sale Co-Conspirators 1, 2 and 3, and others. Tarshish and Dafna then replicated the Short Sale Scheme at Exclusive Homes with the assistance of Short-Sale Co-Conspirators 2,     and others. Herskowitz was a real estate attorney who assisted the Short-Sale Co-Conspirators in completing certain fraudulent short sale transactions originated by both MIP and Exclusive Homes.

15. In the Short Sale Scheme, the Short Sale Co-Conspirators—led by either Aronov if the short sale transaction originated with MIP, or by Dafna and Tarshish if the short sale transaction either originated with Exclusive Homes or moved from MIP to Exclusive Homes—primarily targeted borrowers who owned homes in Brooklyn and Queens, New York, and who were in default on their mortgage loans and in foreclosure proceedings. The Short Sale Co-Conspirators contacted borrowers who owned such properties and attempted to persuade the borrowers to sell their homes to the Short Sale Co-Conspirators in short sale transactions. The Short Sale Co-Conspirators typically promised to pay or paid the borrower money to induce him or her also to sign (a) an agreement with a real estate broker to list the property for sale; (b) an authorization to allow a third-party negotiator to negotiate the short sale with the lender on the borrower's behalf; and (c) a contract to sell the property to a corporate entity controlled by the Short Sale Co-Conspirators. These documents were typically sent to the lender or servicer, often located

outside of New York, by a wire transmittal that originated from Brooklyn or Queens, New York, such as an email or facsimile.

16.     After a borrower agreed to sell his or her property in a short sale coordinated by the Short Sale Co-Conspirators, they did not market the property to other prospective buyers, regardless of any requirement to do so by the lender or servicer.  Instead, they worked together to ensure that the Short Sale Co-Conspirators purchased the property for the lowest price that the lender or servicer would accept.  The broker who had listed the property for sale told any potential purchaser who inquired about the property that the property was already "under contract" or otherwise not available for a showing.  The third-party negotiator, identified to the lender or servicer as the borrower's agent and sometimes the same party who purportedly acted as the listing broker for the property, typically worked for the Short Sale Co-Conspirators and often was paid fees by the Short Sale Co-Conspirators in addition to and above any commission or fee disclosed to the lender or servicer.  If a short sale offer was rejected by the lender or servicer, another corporate entity created by the Short Sale Co-Conspirators would submit another short sale offer after waiting for a period of time.  The longer a property appeared to have been on the market, the greater the likelihood was that the lender or servicer would accept a proposed short sale price below any objective appraisal of the property's value.  After the borrower agreed to participate in a short sale of a property with the Short Sale Co-Conspirators, the Short Sale Co-Conspirators

often took control of the property, evicted or paid any tenants living in the property to move out and, on occasion, arranged to damage the property to lower its appraised value.

17.     On occasion, the Short Sale Co-Conspirators paid a borrower money to transfer the deed of ownership of his or her property to a Short Sale Co-Conspirator while the Short Sale Co-Conspirators negotiated a short sale on behalf of the borrower with the lender or servicer.  The deed transfer provided funds to the borrower, prevented the borrower from selling the property to another purchaser and gave the Short Sale Co-Conspirators control of the property even if the short sale was not approved.  In instances involving such a deed transfer, certain borrowers were told only that they were agreeing to a short sale and did not understand that they were, in fact, transferring their ownership rights to their property. Subsequently, prior to the closing of any approved short sale, the Short Sale Co-Conspirators transferred the deed back to the borrower for no consideration so that title of the property could be conveyed from the borrower to the short sale purchaser at the short sale closing in conformity with the terms of the sales contract signed by the borrower and provided to the lender or servicer as part of the short sale approval process.

18.     The Short Sale Co-Conspirators also often filed fraudulent UCC-1 Financing Statements on properties the Short Sale Co-Conspirators intended to purchase so as to deter, or to obtain money from, other prospective buyers, who would need the filed UCC-1 Financing Statements terminated to clear the title of the property.

19.     When the Short Sale Co-Conspirators submitted documentation to obtain approval for a short sale, they provided false, misleading and incomplete information

to the lender or servicer.  Among other things, in the required short sale affidavit and transaction documents, the Short Sale Co-Conspirators did not disclose when payments had been made to the borrower, that the property was not marketed as required and that the agents for the borrower and purchaser were affiliated by commercial enterprise with the buyer.  These documents were typically sent to the lender or servicer, often located outside of New York, by a wire transmittal that originated from Brooklyn or Queens, New York, such as an email or facsimile.  Furthermore, the Short Sale Co-Conspirators did not disclose all the past and future payments, including fees and commissions, to be paid to the Short Sale Co-Conspirators in connection with the short sale.  The money due to the lender from a short sale often was transmitted by a wire transfer to the lender's or servicer's bank account after the closing.

20.     During different and sometimes overlapping periods of time, various groupings of Short Sale Co-Conspirators worked together in the Short Sale Scheme.  From approximately December 2012 through December 2016, Aronov, Konstantinovskiy and Tarshish, together with others, worked on fraudulent short sales coordinated by Aronov where the primary beneficiaries of the Short Sale Scheme were the owners of MIP, including Aronov (the "MIP Scheme").  From approximately January 2014 through January 2019, Aronov, Tarshish, Dafna and Herskowitz, together with others, worked on fraudulent short sales where the primary beneficiaries of the Short Sale Scheme were Dafna and Tarshish (the "Exclusive Homes Scheme").  The MIP Scheme and the Exclusive Homes Scheme both

involved fraudulent short sales as described in the paragraphs above. Multiple Short Sale Co-Conspirators participated in both schemes.



Short Sale Co-Conspirator 2 worked for Aronov and Tarshish at MIP, and then worked with Dafna and Tarshish at

Exclusive Homes.

Among

other things, Short Sale Co-Conspirator 2 directly approached homeowners and persuaded them to sell their properties in short sales coordinated by MIP or Exclusive Homes. Short Sale Co-Conspirator 2 also filed hundreds of fraudulent UCC-1 Financing Statements on properties that Exclusive Homes wanted to purchase to try to ensure that Exclusive Homes

and Short Sale Co-Conspirator 2 would get paid money if another party ended up purchasing the property.

## IV. Select Transactions Involving Dafna

23. The following are examples of short sale transactions executed by the Short Sale Co-Conspirators, that involved Dafna, as part of the Short Sale Scheme. I have not described every short sale transaction set forth in the indictment nor have I described every transaction involving Dafna

A. 1219 Jefferson Avenue, Brooklyn, New York

24. Aronov, Konstantinovskiy, Dafna, Tarshish and Herskowitz, together with others, coordinated a short sale transaction to purchase a residence located at 1219 Jefferson Avenue, Brooklyn, New York ("1219 Jefferson Avenue"), for a price of $275,000 on or about July 22, 2014, as follows:

(a) In or about July 2013, Short Sale Co-Conspirator 2 initiated contact with the borrower who had defaulted on the mortgage loan for the property (the "1219 Jefferson Avenue Seller"), and persuaded her to sell 1219 Jefferson Avenue in a short sale coordinated by Aronov at MIP and Konstantinovskiy at NHA. Financial Institution 1, an entity the identity of which is known to the Grand Jury, held the mortgage loan for 1219 Jefferson Avenue. On or about July 2, 2013 and October 21, 2013, the 1219 Jefferson

Avenue Seller signed a contract to sell 1219 Jefferson Avenue to an entity called 1219 Jefferson Ave. Inc., which was controlled by Aronov.

(b)     In or about 2014, the 1219 Jefferson Avenue Seller also began working with representatives of Exclusive Homes, while Konstantinovskiy and others at NHA continued to work on getting the short sale to 1219 Jefferson Ave. Inc. approved by the servicer.  As a condition of the short sale approval, the servicer required the parties to the transaction to sign a Short Payoff Arms-Length Affidavit, which stated, among other things, that "there are no agreements, understandings, or contracts relating to the current or subsequent sale of [the property] that have not been disclosed to the Servicer," and that "all amounts to be paid to any party . . . in connection with the short payoff transaction have been disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement."

(c)     Prior to the short sale closing but after it had been approved by the servicer, in or about July 2014, Dafna, Tarshish and Aronov agreed to sell 1219 Jefferson Avenue for approximately $625,000 to a purchaser ("Subsequent Purchaser 1") located by Aronov.  As part of this transaction, ownership of 1219 Jefferson Ave. Inc., the entity Aronov controlled that had entered into the contract to purchase the property, was transferred to Subsequent Purchaser 1 on or about July 23, 2014.

(d)     On or about July 23, 2014, the short sale closed at a purchase price of $275,000, and the 1219 Jefferson Avenue Seller transferred the property to 1219

Jefferson Ave. Inc.  Also on or about July 23, 2014, Herskowitz wired approximately

$252,755 to the servicer's bank account to satisfy the short sale payoff amount due.

(e)     On or about August 28, 2014, Aronov emailed Tarshish a

spreadsheet entitled "1219 Jefferson Avenue, Brooklyn Recap 8-26-14."  The spreadsheet

reflected the property's "sales price" of $625,000, and deducted both the "purchase price" of

$275,000 and various expenses that had not been reflected on the HUD-1 Settlement

Statement, for a total "net profit" from the transaction of $158,772.01.  The spreadsheet

further noted that of the "net profit," $79,386 was due to Aronov, $47,631.60 was due to

Tarshish and $31,754.40 was due to Short Sale Co-Conspirator 2.  Subsequent emails

between Short Sale Co-Conspirator 2, Tarshish and Dafna indicate that Tarshish and Dafna

paid Short Sale Co-Conspirator 2 the $31,754.40 due to her from this transaction in

installments between approximately October 2014 and December 2014.

B.     1319 Jefferson Avenue, Brooklyn, New York

25.     Aronov, Konstantinovskiy, Dafna and Tarshish, together with others,

coordinated a short sale transaction to purchase a residence located at 1319 Jefferson

Avenue, Brooklyn, New York ("1319 Jefferson Avenue"), for a price of $550,000 on or

about September 17, 2014, as follows:

(a)     In or about April 2013, Short Sale Co-Conspirator 2 initiated

contact with the borrower who had defaulted on the mortgage loan for the property (the

"1319 Jefferson Avenue Seller"), and persuaded him to sell 1319 Jefferson Avenue in a short

sale coordinated by Aronov at MIP and Konstantinovskiy at NHA.  Fannie Mae held the

mortgage loan for 1319 Jefferson Avenue.  In or about 2014, the 1319 Jefferson Avenue

Seller also began working with representatives of Exclusive Homes.  On or about April 28,

2014, Tarshish incorporated 1319 Holdings LLC, which was created to purchase 1319

Jefferson Avenue.

        (b)    To establish control over the property, on or about July 15,

2014, Tarshish wrote the 1319 Jefferson Avenue Seller a $20,000 check from Eliya

Properties LLC, an entity controlled by Tarshish.  In return for the $20,000, the 1319

Jefferson Avenue Seller provided the deed to 1319 Jefferson Avenue to Eliya Properties

LLC.

        (c)    In or about August 2014, Aronov and Konstantinovskiy

convinced the servicer to approve a short sale of 1319 Jefferson Avenue to 1319 Holdings

LLC for a price of $550,000.  The approval was contingent on a number of conditions,

including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the

receipt of a Short Sale Affidavit.

        (d)    Prior to the short sale closing but after it had been approved by

the servicer, in or about September 2014, Dafna, Tarshish and Aronov agreed to sell the

property to a purchaser ("Subsequent Purchaser 2") located by Aronov for approximately

$720,000.  On or about September 15, 2014, Short Sale Co-Conspirator 2 emailed Tarshish

and objected to selling 1319 Jefferson Avenue to Subsequent Purchaser 2 instead of a

different purchaser from whom she had also received a $720,000 offer for the property.  On

or about September 15, 2014, Tarshish emailed Short Sale Co-Conspirator 2 in response and

stated, "[What] is the deferent [sic]?  720 it's 720, I'm trying to get more."

        (e)      Eliya Properties LLC transferred the deed back to the 1319

Jefferson Avenue Seller immediately prior to the short sale closing so that title of the

property could transfer directly from the 1319 Jefferson Avenue Seller to 1319 Holdings

LLC, the corporate entity approved to purchase the property.  On or about September 17,

2014, the short sale closed.

        (f)      After the short sale closed, the final HUD-1 Settlement

Statement and Short Sale Affidavit, both dated September 17, 2014, were transmitted to the

servicer.  The Short Sale Affidavit was signed by the 1319 Jefferson Avenue Seller,

Konstantinovskiy and Subsequent Purchaser 2, and it contained material misrepresentations,

including that there were no "agreements, understandings, or contracts relating to the current

or subsequent sale of the property that have not been disclosed to the Servicer," and that "all

amounts to be paid to any person or entity . . . in connection with the short sale have been

disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement

Statement."  In reality, neither the actual purchase price paid by Subsequent Purchaser 2 nor

the past and future payments to the 1319 Jefferson Avenue Seller and the Short Sale Co-

Conspirators, including Aronov, Konstantinovskiy, Tarshish and Dafna, had been disclosed to the servicer.

        (g)     Fannie Mae calculated its loss on the mortgage loan for 1319 Jefferson Avenue to be approximately $290,268.

    C.     <u>1055 Herkimer Street, Brooklyn, New York</u>

        26.     Aronov, Konstantinovskiy, Dafna and Tarshish, together with others, coordinated a short sale transaction to purchase a residence located at 1055 Herkimer Street, Brooklyn, New York ("1055 Herkimer Street"), for a price of $405,000 on or about November 12, 2014, as follows:

        (a)     In or about November 2013, Short Sale Co-Conspirator 2 initiated contact with a representative of a borrower who had defaulted on his mortgage loan for 1055 Herkimer Street (the "1055 Herkimer Street Seller"), and persuaded the 1055 Herkimer Street Seller to sell his property in a short sale coordinated by Aronov at MIP and Konstantinovskiy at NHA.  Fannie Mae held the mortgage loan for 1055 Herkimer Street.  In or about 2014, the Herkimer Street Seller also began to work with representatives of Exclusive Homes.

        (b)     On or about October 7, 2014, the servicer approved a short sale of 1055 Herkimer Street to an entity called Cooper St. Management, LLC, which was controlled by Tarshish and Aronov, at a purchase price of $405,000.  The approval was

contingent on a number of conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of a Short Sale Affidavit.

(c)     Prior to the short sale closing but after it had been approved by the servicer, in or about October 2014, Dafna, Tarshish and Aronov agreed to sell the property to a purchaser ("Subsequent Purchaser 3") located by Aronov for approximately $425,000.  On or about November 10, 2013, Short Sale Co-Conspirator 2 emailed Aronov, Tarshish, Dafna and Short Sale Co-Conspirator 3, and asked "Do we have an update on this closing?  What is the offer on the table?"  In response, on the same day, Short Sale Co-Conspirator 3 replied, "425.  Is the seller available for Wednesday?"

(d)     The short sale closed on or about November 14, 2014.  After the closing, the final HUD-1 Settlement Statement and Short Sale Affidavit, both dated November 12, 2014, were transmitted to the servicer.  The Short Sale Affidavit was signed by the 1055 Herkimer Seller, Konstantinovskiy and Aronov, and it contained material misrepresentations, including that there were no "agreements, understandings, or contracts relating to the current or subsequent sale of the property that have not been disclosed to the Servicer," and that "all amounts to be paid to any person or entity . . . in connection with the short sale have been disclosed to and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement."  Aronov also signed the HUD-1 Settlement Statement.  In reality, neither the actual purchase price paid by Subsequent Purchaser 3 nor the past and

future payments to the Short Sale Co-Conspirators, including Aronov, Konstantinovskiy, Tarshish and Dafna, had been disclosed to the servicer.

(e)     Fannie Mae calculated its loss on the mortgage loan for 1055 Herkimer Street to be approximately \$237,748.

D.     177 Lewis Avenue, Brooklyn, New York

27.     Aronov, Dafna and Tarshish, together with others, coordinated a short sale transaction to purchase a residence located at 177 Lewis Avenue, Brooklyn, New York ("177 Lewis Avenue"), for a price of \$275,000 on or about April 30, 2015, as follows:

(a)     In or about July 2014, Short Sale Co-Conspirator 2 initiated contact with the borrower who had defaulted on his mortgage loan for 177 Lewis Avenue (the "177 Lewis Avenue Seller"), and persuaded him to sell his property in a short sale to Dafna and Tarshish at Exclusive Homes in exchange for money.

(b)     In or about July 2014, the 177 Lewis Avenue Seller signed a contract to sell 177 Lewis Avenue to 177 Lewis LLC, an entity controlled by Dafna. In addition, the 177 Lewis Avenue Seller transferred his deed for 177 Lewis Avenue to Eliya Properties LLC, an entity controlled by Tarshish, in exchange for approximately \$25,000. On or about July 9, 2014, Short Sale Co-Conspirator 2 e-mailed Tarshish, copying Dafna,

and others, regarding 177 Lewis Avenue, and stated, "We will be buying this deed for \$25k. Please have check and necessary docs prepared for Monday."

(c)     On or about April 6, 2015, the servicer approved a short sale of 177 Lewis Avenue to 177 Lewis LLC for \$275,000, contingent on receiving the required

minimum payoff of $238,483.88, a final signed HUD-1 Settlement Statement and a Short Sale Affidavit signed by all the parties.

(d)      On or about April 7, 2015, Short Sale Co-Conspirator 2 e-mailed Dafna and others regarding the 177 Lewis Avenue transaction, and stated that she expected to be paid her commission, which was not part of the closing costs approved by the servicer, at the short sale closing.  Dafna responded, "don't put ur [sic] discussion with me

about commission that's not on the had [HUD-1 Settlement Statement] on a multi people email!!!! Very smart!!!"

(e)     On or about April 13, 2015, Short Sale Co-Conspirator 2 e - mailed Dafna, asking to be reimbursed $1,000 in connection with "preservation and valuation expenses on the [177 Lewis Avenue] file," and Dafna responded, "You got it."

(f)     Prior to the short sale closing but after it had been approved, Dafna and Tarshish offered the property for sale and agreed to sell it to another individual ("Subsequent Purchaser 4") for over $700,000.

(g)     On or about April 29, 2015, Dafna e-mailed several individuals that he would attend the short sale closing for the 177 Lewis Avenue transaction if Short Sale Co-Conspirator 2 was unable to attend.

(i)     After the short sale closed on or about April 30, 2015, on or about May 1, 2015, Herskowitz wired $239,483.88 to the servicer in connection with this short sale transaction.

(j)     On or about May 18, 2015, Short Sale Co-Conspirator 2 sent Dafna and Tarshish an email titled "177 Lewis Ave. Breakdown," which listed the "purchase price" as $775,000 and deducted both the "bank/closing costs/broker fees" and various expenses that had not been reflected on the HUD-1 Settlement Statement, for a total "profit"

from the transaction of $338,800.  The email indicated that, of the total "profit," $271,040 was to be split between Aronov and Dafna, and $28,800 was due to Short Sale Co-Conspirator 2, with the remaining $38,800 to be shared between two others who had assisted in the sale.

      E.      <u>2403 Dean Street, Brooklyn, New York</u>

      28.      Aronov, Dafna, Tarshish and Herskowitz, together with others, coordinated a short sale transaction to purchase a residence located at 2403 Dean Street, Brooklyn, New York ("2403 Dean Street"), for a price of $265,000 on or August 24, 2016, as follows:

      (a)      In or about 2013, Short Sale Co-Conspirator 2 initiated contact with a representative of a borrower who had defaulted on his mortgage loan for 2403 Dean Street (the "2403 Dean Street Seller"), and persuaded the 2403 Dean Street Seller to sell his property in a short sale coordinated by Aronov at MIP and Konstantinovskiy at NHA.  In or about 2014, the 2403 Dean Street Seller also began to work with representatives of Exclusive Homes.  Aronov arranged to have a fraudulent UCC-1 Financing Statement filed on the property to secure his interest in this transaction.

      (b)      On or about August 15, 2016, the servicer approved a short sale transaction from the 2403 Dean Street Seller to 2403 Dean Holding LLC, an entity created by Short Sale Co-Conspirator 2, at a purchase price of $265,000.  This approval was

contingent on receiving a final signed HUD-1 Settlement Statement and a Short Sale Affidavit signed by all the parties.

(c)     Prior to the short sale closing but after it had been approved by the servicer, Short Sale Co-Conspirator 2 offered the property for sale and received multiple offers at or above $525,000, including an offer from Aronov that was accepted.

(d)     The short sale closed on or about August 24, 2016. Subsequently, the final signed HUD-1 Settlement Statement and a required Short Sale Affidavit, both dated August 24, 2016, were transmitted to the servicer.  The Short Sale Affidavit was signed by the 2403 Dean Street Seller and Short Sale Co-Conspirator 2, and it contained material misrepresentations, including there were "no agreements, understandings, contracts or offers relating to the current sale or subsequent sale of the Property that have not been disclosed to the Servicer;" "[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property, except [any relocation assistance] reflected on the HUD-1 Settlement Statement;" and "[a]ll amounts to be paid to any person or entity … in connection with the short sale have been disclosed and approved by the Servicer and will be reflected on the HUD-1 Settlement Statement."  In reality, neither the actual purchase price paid by Aronov nor the past and future payments to the 2403 Dean Street Seller and the Short Sale Co-Conspirators had been disclosed to the servicer.

(e)     Pursuant to the arrangement between Aronov, Tarshish, Dafna and Short Sale Co-Conspirator 2 that was reached prior to the short sale closing, Aronov acquired 2403 Dean Holding LLC on or about August 24, 2016, paying both the amount

required by the servicer to close the short sale and a portion of the difference between that amount and $525,000 to Short Sale Co-Conspirator 2, Dafna and Tarshish.

(f)     On or about August 24, 2016, Herskowitz, on behalf of Aronov, wired approximately $238,798 to a bank account designated by the servicer and approximately $153,095 to Short Sale Co-Conspirator 2's bank account, both in connection with the short sale transaction.

(g)     On or about August 26, 2016, Short Sale Co-Conspirator 2 emailed Aronov and referenced the "breakdown we discussed."  The email indicated that the price for 2403 Dean Street was $540,000.  It further indicated that, in connection with the short sale, Short Sale Co-Conspirator 2 should have been wired $155,177.61, including $20,862.93 for Tarshish and Dafna, but that she only received $153,095.22.  In the email, Short Sale Co-Conspirator 2 asked Aronov to pay her the additional $2,082.39.

(h)     Subsequently, in or about January 2017, Aronov sold 2403 Dean Street for approximately $840,000.

F.     65 Glen Street, Brooklyn, New York

29.     Aronov, Dafna and Tarshish, together with others, coordinated a short sale transaction to purchase a residence located at 65 Glen Street, Brooklyn, New York ("65 Glen Street"), for a price of $200,000 on or about March 15, 2018, as follows:

(a)     In or about 2017, Short Sale Co-Conspirator 2 initiated contact with the borrower who had defaulted on her mortgage loan for 65 Glen Street (the "65 Glen

Street Seller"), and persuaded her to sell her property in a short sale coordinated by Dafna and Tarshish at Exclusive Homes. Freddie Mac held the mortgage loan for 65 Glen Street.

(b)     Prior to the short sale closing but after it had been approved by the servicer, Dafna and Tarshish agreed to sell the property to a purchaser ("Subsequent Purchaser 5") for a price above the short sale price. The short sale approval was contingent on a number of conditions, including the receipt of a final HUD-1 Settlement Statement approved by the servicer and the receipt of a Short Sale Affidavit.

On or about March 15, 2018, Short Sale Co-Conspirator 2 emailed a number of individuals, including Tarshish, Dafna and counsel for Subsequent Purchaser 5, and provided "an itemized list of expenses NOT ON THE HUD that are needed for the closing today," which totaled approximately $180,000.

(d)     The short sale closed on or about March 15, 2018. After the closing, the final HUD-1 Settlement Statement and a Short Sale Affidavit, both dated March 15, 2018, were transmitted to the servicer. The Short Sale Affidavit was signed by the 65 Glen Street Seller, Subsequent Purchaser 5 and an agent, and it contained material misrepresentations, including that "[n]either the Seller(s) nor the Buyer(s) will receive any funds or commissions from the sale of the Property, except [any relocation assistance] reflected on the Closing Disclosure;" there were no "agreements, understandings, or contracts relating to the current or subsequent sale of the property that have not been

disclosed to the Servicer," and that "all amounts to be paid to any person or entity . . . in connection with the short sale have been disclosed to and approved by the Servicer and will be reflected on the Closing Disclosure."  In reality, neither the actual purchase price paid by Subsequent Purchaser 5 nor the past and future payments to the 65 Glen Street Seller and the Short Sale Co-Conspirators, had been disclosed to the servicer.

        (e)      On or about March 15, 2018, Subsequent Purchaser 5 also signed a mortgage loan agreement, secured by 65 Glen Street, for $525,000.  Counsel for the mortgage lender to Subsequent Purchaser 5 provided Short Sale Co-Conspirator 2 with a check for $55,000 dated March 15, 2018, which included the notation "65 Glen."

        (f)      Freddie Mac calculated its loss on the mortgage loan for 65 Glen Street as approximately $665,593.

        30.     In total, the Short Sale Co-Conspirators made millions of dollars in profits by selling properties for far more money than the short sale prices they had paid for the properties.

## V.     **Dafna's Control of Exclusive Homes**

        31.     While Dafna's name is not specifically listed on many of the corporate documents related to the Exclusive Homes short sale transactions, Dafna, along with Tarshish, controlled Exclusive Homes during the period the offices on Bedford Avenue were open, primarily between 2014 and 2016.  On or about January 20, 2017, Dafna signed an affidavit in a civil lawsuit in which Dafna identified himself as the "owner of Exclusive Homes Realty Group, Inc."  Exclusive Homes Realty Group, Inc., et al. v. Carillo and

Torres, Sup. Ct. Kings Cnty, No. 502118/2017. Dafna also stated in the affidavit that while a

former employee of Exclusive Homes "formed [corporate] entities using her name and

signature as part of Exclusive Homes Realty's Group's business practice, to facilitate the

purchase of different properties[, said] entities are formed, operated, managed exclusively

by Exclusive Homes Realty Group, and they are not owned by the individual agent or broker,

but by Exclusive Homes Realty Group, Inc."

32.     Moreover, on or about February 25, 2015, Short Sale Co-Conspirator 2

and Dafna exchanged a series of messages disputing who owned the right to pursue specific

short sale transactions for Exclusive Homes. Dafna e-mailed Short Sale Co-Conspirator 2,

"I'm the owner of all [these] files!" On the same day, Dafna emailed a group of individuals

associated with Exclusive Homes and the short sale processors, "Guys there is no such things

[Short Sale Co-Conspirator's 2 files]!!! It's all my deals that's she's an agent on them!!! So if

anyone with [sic] will do somethings on [those] files without my consent he will be

responsible for any damage [I'll] have!!! Pleas [sic] remove her from all emails on any of

MY DEALS !!" Despite this e-mail, Dafna and Short Sale Co-Conspirator's 2 continued to

work on additional transactions.

33.     During the course of the investigation, on or about January 30, 2019, I

interviewed Herskowitz, who stated, among other things and in sum and substance, that prior

to Herskowitz's arrest in March of 2017 by the Queens District Attorney's Office for his

involvement in an unrelated deed fraud case, Herskowitz represented Dafna and Tarshish in

hundreds of real estate transactions, mostly short sales, in the New York area between 2014

and March 2017. Herskowitz stated that Dafna and Tarshish copied their short sale business, known as Exclusive Homes, from Aronov. Among other things that he did for Dafna and Tarshish, Herskowitz stated he sent money through his IOLA account to consummate short sale transactions. Herskowitz also stated that, in or about 2015, Dafna opened the Whitestone Asset Group, Inc., and this company was to get investors in Israel to invest money in short sales in New York City.

## VII. **Dafna's Use of Nominee Bank Accounts and Cash**

34. During the course of the investigation, I reviewed bank records of accounts controlled by numerous individuals, including Dafna and Herskowitz. I determined that Dafna generally does not hold many assets in his own name but often moves money between accounts controlled by others, i

which appears to be an effort, in part, to disguise the source or ownership of the funds. For example, agents identified over \$30 million in monetary transactions associated with Dafna and short sale transactions that were conducted through Herskowitz's Interest on Lawyer Trust Account ("IOLA") between 2014 and March 2017, including numerous wire transfers to and from Israel and China.

35. Agents also identified numerous financial transactions between Herskowitz and                                      which appear to have been conducted on behalf of Dafna, as follows:

(a) Between January 2015 and September 2016, Herskowitz wrote more than 30 checks from his IOLA account to                           anging in amounts from \$5,000 to

\$50,000, which all included a memo line notation "Tomer."

 (b) Short Sale Co-Conspirator 2 also sent money to and received money from ▮▮▮▮▮▮▮ on behalf of Dafna multiple times, including a Chase quick pay transfer to ▮▮▮▮▮▮ of \$1,800 on or about September 15, 2017, and a two Chase quick pay transfers from ▮▮▮▮▮▮ totaling \$3,400 in or about March 2018.

 (c) Tarshish also sent money to and received money from ▮▮▮▮▮▮▮ including a Chase quick pay transfer of \$2,000, on or about July 3, 2014.

 (d) Entities associated with Aronov, also gave money to ▮▮▮▮▮▮▮ including Chase quick pay transfer of \$5,000 from LL Organization Inc. to ▮▮▮▮▮ on or about January 27, 2017.

 (e) Exclusive Homes Realty Group, Inc. wired ▮▮▮▮▮ \$3,000 on or about April 21, 2017.

 36. Agents have also identified a number of bank accounts and real estate properties that are held in the name of Dafna's employees, which appear to be owned or controlled by Dafna.

 37. Agents are aware that Dafna currently owes the Internal Revenue Service large amounts of money in unpaid taxes.





## VIII. Ongoing Short Sale Transactions

40.     While Exclusive Homes closed its Bedford offices in or about 2016,

Dafna and Tarshish appear to still be working on transactions related to the Short Sale

Scheme.



## IX.    The Dafna Devices

42.    On or about May 15, 2019, Dafna re-entered the United States on a

flight from Tel Avi, Israel, through John F. Kennedy International Airport.  Dafna was

carrying two iPhones, an iPhone X and an iPhone Xs, and an iPad Pro (the "Dafna

Devices.").  During the course of the border inspection by United States Customs and Border

Protection ("CBP"), Dafna stated that he currently lived at the PREMISES, which he stated

is a rental property, with his wife, Marcela Dafna, and his children.[3] Dafna also stated that he owed the Internal Revenue Service approximately $2,000,000, he worked for himself in construction, he was the majority stock holder of B.H. Whitestone Group Ltd., and Dafna had traveled to Israel to attend board meetings associated with that company. Dafna also stated that his wife was a housewife, and she had a small business that he knew nothing about. The CBP and Special Agents with HSI, including an agent who was familiar with the instant ongoing investigation, created forensic images of the Dafna Devices.

43. Although the forensic images of the Dafna Devices were lawfully in HSI's possession since May 15, 2019, in an abundance of caution, on or about August 23, 2019, the government obtained a search warrant authorized by the Honorable Steven M. Gold, United States Magistrate Judge, to search the forensic images of the Dafna Devices for evidence related to violations of Title 18, United States Code, Sections 1343 (wire fraud), 1344 (bank fraud), 1349 (conspiracy), 1956 and 1957 (money laundering).

44. According to the device information obtained from the Dafna Devices; (1) the iPhone X was associated with Apple IDs 

2) the iPhone Xs was associated with Apple ID 

and (3) the iPad Pro was associated with Apple IDs 

nd d                              Preliminary searches of the forensic

---

3

4

images[5] of the Dafna Devices has indicated that Dafna has retained images, text messages and information related to the Short Sale Scheme on the Dafna Devices, including information that was sent to the PREMISES, as well as a large amount of financial information regarding the various entities and bank accounts Dafna controls. Among other things, there were multiple text messages and e-mails between Dafna and Short Sale Co-Conspirator 2 and between Dafna and Tarshish[6] retained on the Dafna Devices that were dated between 2014 and 2019. T

on the Dafna Devices. In addition, the Dafna Devices contained photos of documents that related to the Short Sale Scheme including the following:

---

[5]     Many of the messages on the Dafna devices are in Hebrew and messages that appear to be pertinent are still in the process of being translated.

[6]     Many of the messages between Dafna and Tarshish are in Hebrew.



re





47.     The foregoing evidence demonstrates that Dafna is still engaged in conduct related to the Short Sale Scheme and that he not only has hard copy documents related to that scheme sent to his residence, he keeps documents related to those schemes in devices found on the PRESMISES.

48.     The Dafna Devices also contained information that indicated that both Dafna and Marcela Dafna conduct business for Dafna from the PREMISES, and Dafna may keep large sums of cash at the PREMISES. For example, on or about February 22, 2018, a New York limited liability company known as 3DJ Management LLC was incorporated, using the address of the PREMISES. On the Dafna Devices is a photo of an invoice from 3DJ Management LLC to 5 Borough Construction, another company Dafna controlled, dated April 15, 2019, for $106,000 for "scaffolding," which lists the PREMISES as the address for 3DJ Management LLC. Also, a photo of an American Express Business Credit Card in the name of "Tomer Dafna, 3JD Management LLC," also was found on the Dafna Devices. On

the Dafna Devices is a message that Dafna sent to an individual, on or about October 12, 2018, asking for a loan or advance of money. Dafna wrote, "u think there is any chance to get the 20 more until We do the deal or not ... and I promise some people to pay them on work they doing ... and now they seeting [sic] in my office ... holding me hostage." After he received an affirmative response, Dafna then sent the bank account information for 3DJ Management LLC, including the address of the PREMISES, for a wire transfer.

49.     The Dafna Devices also contained information that indicated that Dafna engaged in real estate business associated at the PREMISES. On or about October 8, 2018, as reflected on the Dafna Devices, Dafna exchanged texts with a business associate about "this Bronx deal" that related to "25 units." Dafna texted his associate, "Can u come to my house now ?"



51.     While the Dafna Devices contain certain text messages, e-mails and

images that are relevant to the Short Sale Scheme, it is clear that the bulk of the relevant documents relating to Dafna's ownership and participation in the short sale transactions, and the disposition of the proceeds that he received from those transactions are not included on the Dafna Devices. As noted above, letters were sent to Dafna's home in connection with the Short Sale Scheme, and it clear that spreadsheets, paper files and electronic files were created and maintained by the Short Sale Co-Conspirators to keep track of the transactions.

While it is possible that some of these files are maintained at other locations, such as Dafna's office for 5 Borough Construction, I believe that it is likely that Dafna maintains at home evidence relating to the Short Sale Scheme and financial records that reflect the assets and entities that he has owned or currently owns even if held in the names of nominees.

## V.    **THE PREMISES**

52.    The PREMISES, KNOWN AND DESCRIBED AS 9 STREAM COURT, GREAT NECK, NEW YORK, 11023, described in Attachment A, is likely to contain evidence, fruits, and instrumentalities of the fraudulent short sale scheme described above. The investigation has confirmed that Dafna resides at the PREMISES, and has been associated with that address since August 2016.  Dafna has listed the PREMISES as his home address on his New York Driver's license, which was issued in January 2019.  FHFA-

OIG and HSI agents conducting surveillance of the PREMISES on April 2, 2019, July 26, 2019, and September 4, 2019, observed Dafna's vehicle parked at the PREMISES.

53.    In addition, as described in paragraphs above, it appears that Dafna is conducting business from the PREMISES and keeps records and documents relating to his current and past business at his home, including documents related to the Short Sale Scheme. While Dafna does have an office for 5 Borough Construction located at 96-90 Springfield Blvd, Jamaica, New York, it appears that Dafna also works from the PREMISES on occasion as indicated by messages sent and received over the Dafna Devices, receives business correspondence at the PREMISES and that 3DJ Management LLC is operated from the PREMISES.   Although 3DJ Management LLC is held in Marcela Dafna's name, and Dafna told CBP officers on or about May 15, 2015 that he knew nothing about his wife's business, information from the Dafna Devices indicate that this entity is primarily used by Dafna to conduct business and move money.

## VI.    **Technical Background**

54.    As described above and in Attachment B, this application seeks permission to search for records constituting evidence, fruits or instrumentalities of violations of Title 18, United States Code, Sections 1349 (conspiracies to commit wire and bank fraud), 1343 (wire fraud), 1344 (bank fraud), and 1956 and 1957 (money laundering), that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of computers and electronic storage

media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

55.     I submit that if a computer[8] or storage medium[9] is found on the PREMISES that is identified as belonging to or used by Dafna, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently

---

[8]     For purposes of the requested warrant, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[9]     A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded. Examples include external hard drives, CDs and DVDs, and flash drives.

being used by an active file – for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

       c.     Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

       d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

       e.     Based on actual inspection of other evidence related to this investigation, including e-mails, spreadsheets, financial records and images of computer screen shots, I am aware that computer equipment was used to generate, store, and print documents used in the Short Sale Scheme.  There is reason to believe that there is a computer system currently located on the PREMISES.

       f.     As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that

establishes how the computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the PREMISES because:

g.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

h.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data

associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      i.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

      j.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer functions.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      k.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

      56.     In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to "image" the date stored on such devices.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data,

including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the time required for examination, technical requirements, and the variety of forms of electronic media, as explained below:

(a)     The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site.  Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the PREMISES could be unreasonable.  Given the ever-expanding data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(b)     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

(c)      The variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

57.      Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would authorize seizing, imaging, or otherwise copying computers and storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

58.      Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## VII.      **CONCLUSION**

59.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the PREMISES there exists evidence of crimes.  Accordingly, a search warrant is requested.

60.      It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation, and that the main targets described herein have not yet been arrested and there is a risk of flight or that evidence may be compromised.  Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for the THE PREMISES KNOWN AND DESCRIBED AS 9 STREAM COURT, GREAT NECK, NEW YORK, 11023.

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application and search warrant, be sealed until further order of the Court.

Jaclyn Nunez
Special Agent
FHFA-OIG

Sworn to before me this
_____ day of September, 2019

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN   DISTRICT OF NEW YORK

**ATTACHMENT A**
<u>Property to Be Searched</u>

The property to be searched is the THE PREMISES KNOWN AND DESCRIBED AS 9 STREAM COURT, GREAT NECK, NEW YORK, 11023.

The PREMISES are located 9 Stream Court, Great Neck, New York 11023. The PREMISES is a large single family residence. A photograph of the exterior of the PREMISES is below.  According to public records, this property is a 6 bedroom, 5.5 bathroom single family residence with approximately 5,400 square feet.



**ATTACHMENT B**
Property to be Seized

1.    All records found at the PREMISES described in Attachment A that relate to violations of wire fraud, bank fraud, and conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Sections 1343, 1344, and 1349, and money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (the "Subject Offenses"), involving Tomer Dafna and any co-conspirators (the "Subject Individuals"), since December 1, 2013, including;

    a.  any cash, money orders, or other cash substitutes;

    b.  records related to real estate transactions involving misrepresentations to homeowners, mortgage loan lenders or mortgage loan servicers, or real estate investors;

    c.  records, including bank records, check books, financial ledgers, and other information related to the disposition of proceeds obtained from fraudulent real estate transactions;

    d.  records reflecting communications among the participants in the scheme to engage in fraudulent real estate transactions;

    e.  all bank records, checks, credit card bills, account information, and other financial records.

2

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    f.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    g.  evidence of the times the COMPUTER was used;

h.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

i.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

j.  records of or information about Internet Protocol addresses used by the COMPUTER;

k.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

l.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic,

4

or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.